Cesar M. LOPEZ, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–73357.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2004.

Filed May 3, 2004.

---

Evelyn Zneimer, Los Angeles, CA, for the petitioner.

Joshua E. Braunstein (argued) and Anh–Thu P. Mai, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before SILVERMAN, GOULD, and BEA, Circuit Judges.

GOULD, Circuit Judge:

Petitioner Cesar Margarito Lopez is a 47–year old native of Guatemala. He entered the United States on February 28, 1991, without inspection by an immigration

officer. The Immigration and Naturalization Service (INS)[1] placed Lopez in deportation proceedings by filing an Order to Show Cause (OSC) on June 28, 1994, charging Lopez with entry without inspection into the United States.

Lopez appeared before an Immigration Judge (IJ) with counsel, conceded the factual allegations in the OSC and his deportability, and stated his intention to apply for asylum and withholding of deportation. On April 26, 1999, the IJ issued his decision finding Lopez deportable and ineligible for asylum and for withholding of deportation. The IJ concluded that Lopez did not offer evidence establishing that Lopez had been persecuted on account of a protected ground. Lopez was, however, granted voluntary departure.

Lopez appealed to the Board of Immigration Appeals (BIA), which dismissed Lopez's appeal in a per curiam opinion on September 24, 2002, with Board Member Espenoza dissenting. The BIA reasoned that: (1) Lopez had not established past persecution; (2) changed country conditions in Guatemala justified denial of Lopez's claims; and (3) a humanitarian grant of asylum was unwarranted. Lopez timely petitions for review.

Because Lopez's deportation proceedings were initiated on June 28, 1994, and his final deportation order was issued on September 24, 2002, we have jurisdiction under 8 U.S.C. § 1105a(a)(1), as amended by the transitional rules under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996). We grant the petition and remand the issue of changed country conditions in Guatemala as well as Lopez's application for a human-itarian grant of asylum to the BIA for reassessment. We also remand Lopez's application for withholding of deportation and relief under the Convention Against Torture to the BIA for its consideration in the first instance.

## I

Lopez testified before the IJ that he left Guatemala because he was receiving death threats from leftist guerrillas opposed to the Guatemalan government. He gave the following information in his written asylum application and in testimony at his April 26, 1999 hearing before the IJ:

Lopez was a member of the Guatemalan army, and joined the civil patrol for one year in 1987. His duties in the civil patrol included informing the Guatemalan army about the location of the guerrillas. Lopez also worked as a storekeeper on the plantation of a wealthy landowner in San Marcos, Guatemala.

Lopez first encountered violence in 1988, when guerrillas went to Lopez's workplace, tied his hands, locked him in a grain warehouse and set the warehouse on fire. Lopez stated in his written asylum application:

On 1988, while I was working, the leftists extremists came into the store house and tried to steal everything, after it, they fired the house, they maltreated me, they obligued (sic) me to put my hands up and locked me in while the house was on fire. Once all the machinery (sic) started to explote (sic) I didn't know what to do, I tried everything to escape and with the help of some neighbors I could escape. I tried to fight the fire and to safe (sic) the merchandise of

1. In accordance with the Department of Homeland Security Reorganization Plan, as of March 1, 2003, the INS was abolished and its functions were transferred to the Department of Homeland Security. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 848 n. 1 (9th Cir.2003); 6 U.S.C. § 542.

my employer, but it was imposible (sic), the fire was so enormous that I couldn't do much.

In his testimony before the IJ, Lopez clarified that he was locked in a grain warehouse, that the guerrillas were from "ORPA,"[2] and that his hands were "tied up" during this 1988 incident. Lopez suffered burns on his hands and back as a result of this attempt on his life.

ORPA guerrillas tried again to kill Lopez in 1990 and 1991, telling Lopez that he should be helping the guerrillas take property from the rich and not working for the rich. The guerrillas also harassed Lopez because of his family's participation in the Guatemalan army. Guerillas also went to Lopez's home to look for him, forcing Lopez into hiding.

Lopez's father was an administrator on the same plantation where Lopez worked. Lopez testified that the guerrillas did not want to see Lopez's family working for wealthy people. Guerillas kidnapped Lopez's father in 1979 because he would not cooperate with them. Lopez's father escaped, but continued to endure harassment from the guerrillas. Lopez's mother-in-law and two brothers-in-law were assassinated by the guerrillas because they refused to cooperate with them. ORPA guerrillas held recruitment meetings at the plantation where Lopez and his father worked, where the guerrillas told local residents that the guerrillas needed their cooperation and that the residents should not work for wealthy people.

Lopez and his wife illegally entered the United States in 1991, leaving his three children in Guatemala. Lopez later brought all three of his children to the United States. Lopez stated in his asylum application, and supported in his testimony, that he fears persecution by the guerrillas if he returns to Guatemala, and that the Guatemalan government would be unable to control the guerrillas' activities.

## II[3]

■ We accept Lopez's testimony as true because neither the IJ or the BIA made an adverse credibility finding. *Ruano v. Ashcroft*, 301 F.3d 1155, 1159 (9th Cir.2002). We will uphold the BIA's denial of asylum if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted).

To qualify for asylum, Lopez must establish that he is unwilling or unable to return to Guatemala "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Ruano*, 301 F.3d at 1159 (internal quotation marks omitted). "Establishing past persecution triggers a rebuttable presumption of a well-founded fear of future persecution." *Id.* (internal quotation marks omitted).

■ Because Lopez claims eligibility for asylum based on past persecution, he must provide evidence of "(1) an incident, or

---

**2.** "ORPA" is the short form for "Organización Revolucionaria del Pueblo en Armas," which translates to "Revolutionary Organization of the People in Arms." 1998 Human Rights Watch Report on Guatemala, *at* <http:/ /www.hrw.org/worldreport/Americas–06.htm# P615—124511>.

**3.** We reject the Respondent's contention that Lopez has waived his legal arguments before

our court because his opening brief referred to the decision of the IJ as opposed to that of the BIA. The Appellate Commissioner granted Lopez's motion to file a supplemental opening brief on August 6, 2003, and Lopez filed the supplemental opening brief on September 5, 2003; the supplemental brief addressed the BIA's decision.

incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir.2000) (internal quotation marks omitted). As in *Chand*, the main issues are "whether [Lopez] has shown that the harm he suffered rises to the level of persecution, and whether he has shown that he was persecuted on account of a protected ground."[4] *Id.*

■ "Persecution is the infliction of suffering or harm upon those who differ ... in a way regarded as offensive." *Rios v. Ashcroft*, 287 F.3d 895, 900 (9th Cir.2002) (internal quotation marks omitted). We have held that physical harm constitutes persecution. *Chand*, 222 F.3d at 1073 ("Physical harm has consistently been treated as persecution."). Further, "[w]here an applicant suffers such harm on more than one occasion, and ... is victimized at different times over a period of years, the harm is severe enough that no reasonable factfinder could conclude that it did not rise to the level of persecution...." *Id.* at 1073–74.

■ Lopez testified credibly that guerrillas in 1988 locked him in a warehouse and set it on fire. Lopez further testified that the guerrillas tried to kill him in 1990 and 1991. These attempts to murder are a form of physical harm. We have determined that such assaults threatening life itself constitute persecution. *Baballah v. Ashcroft*, 335 F.3d 981, 987–88 (9th Cir. 2003) ("There is no question that persistent death threats and assaults on one's life ... rise to the level of persecution within the meaning of the [Immigration and Nationality] Act.") (internal quotation

marks omitted); *see also Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir.1998) ("[R]ecruitment attempts and death threats are sufficient to show persecution under the Immigration and Nationality Act.") (internal quotation marks omitted). Lopez's credible testimony alone is sufficient to establish past persecution. *Id.*

Faced with this evidence, the BIA nonetheless concluded that "the harm [Lopez] was subjected to does not rise to the level of persecution" because "his injuries were not that severe," noting that Lopez did not seek medical treatment after he was burned in the warehouse fire. We disagree. The credible testimony made plain that Lopez had been placed in a burning warehouse by guerrillas, bound so he could not escape absent help, and had suffered additional threats on his life from the same group. That Lopez did not seek medical treatment for the burns he suffered is hardly the touchstone of whether his treatment by guerrillas amounted to persecution. The BIA's determination that Lopez did not suffer persecution was not supported by substantial evidence. The evidence compels the conclusion that Lopez was persecuted under our traditional standards.

■ But persecution alone is not sufficient to qualify for asylum. Lopez also had to show that the persecution occurred because of a protected ground. More specifically, under the statutory standard, we must next determine whether Lopez was persecuted "on account of" a protected ground. Because Lopez contends that he was persecuted on account of his political opinion, Lopez must establish that he held a political opinion, and that he was persecuted because of that political opinion.

---

**4.** The parties have not disputed that Lopez's previous harms were inflicted by forces that the government was either unable or unwill-

ing to control, and the scope and severity of harmful actions by the guerrillas affecting Lopez on their face bear this out.

*Navas v. INS*, 217 F.3d 646, 656 (9th Cir.2000).

The BIA rejected Lopez's contention that he was persecuted on account of his political opinion, holding that the "on account of" element was not satisfied because the evidence showed only an attempt by the guerrillas to recruit Lopez, and apparently the BIA thought that the harsh, almost deadly, treatment of Lopez by guerrillas was a sanction for his declining of their recruitment. The BIA concluded that "[f]orced recruitment does not constitute a basis for asylum."

Contrary to that conclusion, the record before the BIA powerfully compels a conclusion that the assaults on Lopez were a punishment for his pro-establishment political opinions. Lopez's testimony and application made clear that the guerrillas had chastised him for working on a wealthy landowner's plantation and supporting the rich. Conversely, Lopez stated in his asylum application that he would not cooperate with ORPA guerrillas "against [his] Fatherland." ORPA guerrillas in turn threatened Lopez with death on three occasions, in 1988, 1990, and 1991, because of his politically-based refusal to cooperate with the guerrillas' efforts against the government.

We have previously held that a refusal to cooperate with guerrillas, at least where the refuser was perceived as a political opponent by the guerrillas, may constitute a political opinion for purposes of determining eligibility for asylum. *Rios v. Ashcroft*, 287 F.3d 895, 900 (9th Cir.2002) ("persecution on account of anti-guerrilla sympathies, statements, and activities, amounts to persecution on account of political opinion."). The approach that we took in *Rios* is persuasive here in favor of Lopez's asylum claim. Lopez testified credibly that he was persecuted after he rejected the guerrillas' warnings that he not help the rich and after he refused to cooperate with the ORPA guerrillas because of his pro-establishment political view. Lopez's testimony, found credible by the BIA, establishes that Lopez had a political opinion and was persecuted for that opinion.

We conclude that the record compels the conclusion that Lopez proved that he was persecuted, when burned and when tied up and left to die in a burning building, on account of his political opinion. Because no adverse credibility determination was made, and Lopez's tale in testimony was plausible, his story here must be accepted for purposes of assessing his entitlement to asylum. *Del Carmen Molina v. INS*, 170 F.3d 1247, 1250 (9th Cir.1999) ("Because [petitioner's] uncontradicted, credible testimony was that she was threatened on account of her political opinion, the BIA's determination that [petitioner] was not persecuted on account of her actual ... political opinion is not supported by reasonable, substantial, and probative evidence.").

We hold that the record before the BIA compelled the conclusion that Lopez has established past persecution on account of a protected ground, and he therefore is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

**III**

However, the presumption that Lopez has a well-founded fear of future persecution may be rebutted if the government can show by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality ... on account of race, religion, nationality, membership in a particular so-

cial group, or political opinion." 8 C.F.R. § 1208.13(b)(1)(i)(A). The BIA invoked this principle when, after rejecting Lopez's case for past persecution, the BIA alternatively concluded that Lopez did not have a well-founded fear of future persecution because of changed country conditions in Guatemala. The BIA's analysis of this issue was scanty; the BIA made only two observations in this regard, that "[b]oth civil patrols and guerrillas have been demobilized following a peace agreement," and that "[t]here is no evidence that the current government would be unable or unwilling to protect[Lopez] from future harm."

■ We review the BIA's factual findings regarding changed country conditions for substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1229 (9th Cir.2002); *see also Gonzalez–Hernandez v. Ashcroft*, 336 F.3d 995, 998 (9th Cir.2003). If past persecution is shown, the BIA cannot discount it merely on a say-so. Rather, our precedent establishes that in such a case the BIA must provide an "individualized analysis of how changed conditions will affect the specific petitioner's situation." *Borja v. INS*, 175 F.3d 732, 738 (9th Cir.1999) (en banc) (citation and internal quotation marks omitted). Information about general changes in the country is insufficient for the government to overcome the presumption. *Rios v. Ashcroft*, 287 F.3d 895, 901 (9th Cir.2002).

■ The 1998 State Department report presents a mixed picture of the human rights conditions in Guatemala after the conclusion of the 1996 peace accords. On the one hand, the report notes that the "demobilization of the URNG guerrillas and the restructuring and downsizing of the military helped create a more favorable human rights climate" and that the "overall human rights situation continued to improve measurably" in 1998. More-

over, "[t]he number of extrajudicial killings continued to decline." On the other hand, the same report says that "[l]ynchings, mob attacks, and unsolved killings continued, and the Government frequently was unable to prosecute the perpetrators." The report also notes that"[t]here were at least two allegations of politically motivated killings during the year," and that "[p]opular frustration with the inability of the [Guatemalan] [g]overnment to control crime ... contributed to lynchings and attempted lynchings during the year." In referencing the fact that guerrillas have demobilized, the report notes that "although important progress was made, substantial problems remain."

In light of the foregoing, the BIA's conclusory determination regarding changed country circumstances is not sufficiently individualized to rebut the compelling presumption of well-founded fear of future persecution that arises under the unusual circumstances of this case. This leads us next to consider whether we may now hold that the presumption of a well-founded fear of persecution is not rebutted in Lopez's case by changed country conditions or, on the other hand, if we must remand to the BIA for its determination of the effect on the presumption of changed country conditions, under proper legal standards that require the BIA to make an individualized determination as to Lopez.

This in turn raises an issue on the scope of the Supreme Court's decision in *INS v. Ventura*, 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). In *Ventura*, the BIA had denied an alien's application for asylum. On our consideration of a petition for review, we had determined that the alien was entitled to asylum and withholding of deportation, and we granted the petition. In so doing, we had expressed views on changed country conditions, an issue that had not been addressed

by the BIA. The Supreme Court unanimously held that our court of appeals erred because we were required to remand the case to the BIA for its consideration of changed country conditions in the first instance, as that issue affected the alien's eligibility for asylum. *Ventura*, 537 U.S. at 17, 123 S.Ct. 353. The Court reaffirmed the general rule that "a court of appeals should remand a case to an agency for a decision of a matter that statutes place primarily in agency hands." *Id.* at 16, 123 S.Ct. 353. The Court stressed the importance of this principle in immigration cases. The Court reasoned that "every consideration that classically supports the law's ordinary remand requirement does so here." *Id.* at 17, 123 S.Ct. 353. And the Court specifically noted that:

> The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court to determine whether its decision exceeds the leeway that the law provides.

*Id.*

In *Ventura*, the BIA had made no determination of changed country conditions, and our court stepped in and foreclosed the issue. The Supreme Court concluded that "the Court of Appeals committed clear error here." *Id.* The Court stressed that we had "seriously disregarded the agency's legally mandated role," that we had "independently created potentially far-reaching legal precedent about the significance of political change in Guatemala," and that we "did so without giving the BIA the opportunity to address the matter in the first instance in light of its own expertise." *Id.*

In Lopez's case, the BIA made an "initial determination" of the impact of changed country conditions, and in this sense, Lopez's case is factually different from *Ventura*. Here, the BIA reached a conclusion regarding changed country conditions, but the BIA did so in a faulty way because it did not make an individualized determination as to the effect of country conditions on Lopez's predicament if returned to Guatemala. Despite this factual difference between Lopez's case and *Ventura*, we are not now in a position to say conclusively that the presumption of a well-founded fear of future persecution arising from Lopez's past persecution carries the day without more.

To the contrary, for several reasons a remand is more consistent with the spirit and reasoning of *Ventura* than a conclusive determination by us now. First, a remand is consistent with the general rule of agency remand as stated by the Supreme Court in *Ventura*. *Id.* Second, as was the case in *Ventura*, "remand could lead to the presentation of further evidence of current circumstances in Guatemala—evidence that may well prove enlightening ..." in light of the more than five years that have passed since the 1998 State Department Country Report, relied on by the BIA, was written. *Id.* at 18, 123 S.Ct. 353. Third, because the BIA applied the wrong legal standard to Lopez's case in assessing country conditions, the BIA to date has not taken the opportunity to apply its expertise to this issue of assessing the impact of changed country conditions on an individualized basis for Lopez. Finally, we are aware of no precedent establishing a legal principle limiting the BIA's role on such an issue to "one bite at the apple" in assessing whether the presumption is rebutted by changed country conditions; to the contrary, on general principles, we would expect the agency to have a chance to consider Lopez's case in light of a corrected legal standard. In varied contexts, we have heeded *Ventura's* remand

requirement after determining that the BIA applied an erroneous legal standard in resolving a substantive issue. *See, e.g.,* *Zheng v. Ashcroft,* 332 F.3d 1186, 1197 (9th Cir.2003) (remanding alien's Convention Against Torture claim where the BIA had applied an erroneous legal standard); *Murillo–Salmeron v. INS,* 327 F.3d 898, 902 (9th Cir.2003) (remanding alien's application for adjustment of status where the BIA applied an erroneous legal standard); *Melkonian v. Ashcroft,* 320 F.3d 1061, 1071 (9th Cir.2003) (remanding alien's asylum application where the BIA failed to analyze reasonableness of relocation).

We conclude that it is appropriate to permit the BIA on remand to assess whether changed country conditions rebut the presumption based on the proper legal standards including an individualized determination. Otherwise, we would be improvidently bypassing the agency's expertise in immigration matters committed in the first instance to the agency. Accordingly, on the petition for review of the asylum claim, having held that Lopez established past persecution on account of political opinion, and that the BIA's prior alternative assessment of changed country conditions was incomplete, we remand on the asylum claim to permit the BIA to conduct further proceedings relating to changed country conditions.

## IV

The BIA rejected Lopez's application for a humanitarian grant of asylum, stating that Lopez had not shown "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution." Given our determination that the severity of harms inflicted on Lopez did rise to the level of persecution, contrary to the BIA's prior conclusion, we remand this issue to the BIA for renewed consideration.

We decline to address Lopez's alternate claim for withholding of deportation, which was not addressed by the BIA, and which should be addressed by it in the first instance.[5] Also, we decline to address his claim for relief under the Convention Against Torture ("CAT"), which was not mentioned by the BIA and which should be addressed by it in the first instance.[6]

---

5. The BIA did not address Lopez's claim for withholding of deportation, perhaps because the BIA determined that Lopez did not establish past persecution or perhaps because the BIA thought that country conditions had changed. In light of our conclusion that Lopez's evidence compelled the conclusion that he suffered past persecution on a protected ground, and that the BIA's country conditions analysis was not sufficiently individualized to rebut the presumption that Lopez thus had a well-founded fear of future persecution, the likely premises for the BIA's inattention to withholding of deportation have been vitiated. We do not know how the BIA would view the withholding of deportation issue in light of our decision, and we remand Lopez's claim for withholding of deportation to the BIA for its consideration. *Jahed v. INS,* 356 F.3d 991, 1001 (9th Cir.2004).

6. In denying relief to Lopez, the BIA did not refer to Lopez's CAT claim or any of the standards ·governing CAT relief. We have held that "claims for relief under [CAT] are analytically separate from claims for asylum ...." *Kamalthas v. INS,* 251 F.3d 1279, 1283 (9th Cir.2001); *see also Efe v. Ashcroft,* 293 F.3d 899, 906–07 (5th Cir.2002) ("The Convention Against Torture claim is separate from the claim[ ] for asylum ... and should receive separate analytical attention."). Importantly, "[t]he [BIA] does not have to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Efe,* 293 F.3d at 908 (internal quotation marks omitted). The Respondent conceded this issue after oral argument, filing a motion to remand Lopez's CAT claim on March 12, 2004, in which the government

## V

We grant Lopez's petition for review and remand to the BIA for further proceedings consistent with our opinion.

**PETITION FOR REVIEW GRANTED.**

stated that "the [BIA's] failure to address the CAT claim in its decision warrants remand pursuant to *Kamalthas*." In light of our disposition, we deny the government's motion to remand as moot.