**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SANDEEP KUMAR,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney General,

*Respondent*.

No. 23-308

Agency No.
A216-274-852

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 27, 2024
San Francisco, California

Filed August 2, 2024

Before: Evan J. Wallach,[*] Jacqueline H. Nguyen, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Wallach;
Dissent by Judge Bumatay

---

[*] The Honorable Evan J. Wallach, United States Circuit Judge for the Federal Circuit, sitting by designation.

# SUMMARY[**]

## Immigration

Granting Sandeep Kumar's petition for review of a decision of the Board of Immigration Appeals affirming the denial of asylum and related relief, the panel held that the record compelled the conclusion that Kumar's past harm in India rose to the level of persecution, and remanded.

After Kumar became a member of the Mann Party, he experienced threats and a physical beating from members of an opposing political party. Relying on *Sharma v. Garland*, 9 F.4th 1052 (9th Cir. 2021), the BIA concluded that Kumar did not show that the threats he experienced caused significant actual suffering or harm so as to cumulatively constitute persecution.

The panel concluded that the BIA erred in its reliance on *Sharma*, explaining that the vague threats in *Sharma* were unlike the specific threats that Kumar suffered and, unlike in *Sharma*, the threats Kumar received were "connected" to his physical harm because he experienced both in tandem. The panel also explained that, where—as here—incidents have involved physical harm plus something more, such as credible death threats, the court has not hesitated to conclude that the petitioner suffered persecution.

Thus, the panel concluded that, in the context of India's ongoing political and social turmoil, the record of the cumulative effect of all the incidents compelled the

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

conclusion that Kumar's harm rose to the level of persecution. The panel remanded for the BIA to complete its past-persecution analysis and, as necessary, to consider other issues relevant to asylum eligibility.

Because the BIA relied on its flawed analysis of Kumar's past harm when denying withholding of removal and protection under the Convention Against Torture, the panel also remanded those claims.

Dissenting, Judge Bumatay wrote that there are so many contradictory opinions in the Ninth Circuit's caselaw that it's easy to find a case supporting nearly any position. In Judge Bumatay's view, the majority now added more confusion by saying that *any* physical harm connected to *any* threat is enough to establish persecution. Applying the factors set out in *Sharma*, substantial evidence supported the BIA's conclusion; indeed, there was no way that the panel was *compelled* to conclude that the BIA erred when it simply followed the court's caselaw. Judge Bumatay also wrote that the majority overstepped by engaging in blatant unadulterated factfinding.

## COUNSEL

Inderraj Singh (argued), The Singh Law Office APC, Bakersfield, California, for Petitioner.

Anthony J. Nardi (argued), Trial Attorney; Leslie McKay, Senior Litigation Counsel; Brian Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C.; for Respondent.

**OPINION**

WALLACH, Circuit Judge:

Sandeep Kumar, a native and citizen of India, petitions for review of the final order of the Board of Immigration Appeals (BIA), which dismissed his appeal of the decision by the Immigration Judge (IJ) to deny his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Among other things, the BIA agreed with the IJ's conclusion that Kumar did not establish that his past harm, when cumulatively considered, rose to the level of persecution. Specifically, the BIA determined that Kumar's experience of threats and a physical beating from members of an opposing political party did not constitute persecution when considered cumulatively, because Kumar failed to adequately show that the threats caused him significant actual suffering or harm. We have jurisdiction under 8 U.S.C. § 1252. We grant the petition for review and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Kumar practices the Sikh religion. Prior to his arrival in the United States, he resided in Punjab, India. On January 4, 2017, Kumar joined the Shiromani Akali Dal Mann Party ("Mann Party"), which, as we have previously recognized, "advocates for the creation of Khalistan, a sovereign state for the Sikh people." *Kaur v. Wilkinson*, 986 F.3d 1216, 1219 (9th Cir. 2021). We have also previously recognized that

---

[1] The factual assertions here primarily stem from the BIA's final order and Kumar's credible testimony given during his removal hearing on January 10, 2020.

"Mann Party members have faced persistent harassment, intimidation, threats, and violence in Punjab," the region where Kumar resided. *Id.* The Bharatiya Janata Party ("BJP") is a major Indian political party that opposes the Mann Party. *Singh v. Garland*, 97 F.4th 597, 600 (9th Cir. 2024) [hereinafter *Singh*]. According to Kumar, the BJP is the "central government" that suppresses the Mann Party in Punjab and seeks to convert everyone to Hinduism. Notably, BJP members sought to convert Kumar and his family members to Hinduism by demanding that they change political parties from the Mann Party to the BJP. Kumar requests political asylum on the grounds that he has suffered past persecution at the hands of the BJP for engaging in contrary political activity with the Mann Party in Punjab.

On September 1, 2017, while Kumar was hanging Mann Party posters for an organized rally, four BJP members approached in a vehicle and stopped near him. The BJP members began ripping the posters down, and as they did, they told Kumar to leave his party to join theirs and to sell drugs for them. Kumar said no. The BJP members held wooden sticks and were ready to beat Kumar, but they ran away when people from nearby homes came outside. Although one of them threatened to kill Kumar if he hung posters again, Kumar did not report this confrontation to the police because he thought it was only a threat at the time.

On October 12, 2017, Kumar was riding home on a motorcycle after working at a camp at which the Mann Party talked to villagers about assisting poor women with their weddings. As Kumar stopped his motorcycle, four BJP members, including some of the same men who had previously accosted him, approached him in their vehicle. The four men questioned Kumar as to why he failed to heed their earlier threats and demands that he leave the Mann

Party.  Once again, Kumar replied that he could not leave his party.  This time, the BJP members threw Kumar off his motorcycle onto his side and began attacking him.  They first punched Kumar twice, then one man kicked him while the rest beat Kumar with wooden sticks for approximately two to three minutes.[2]  Kumar's cries and screams attracted a crowd, so the four BJP members threatened Kumar that "if we see you doing this next time[,] we will shoot you," as they fled.

After this beating, Kumar spent two days in the hospital receiving treatment for the injuries he suffered to his knees, forehead, and back.  Kumar then attempted to report this second confrontation with the BJP members at a nearby police station on two occasions.  Initially, Kumar was ignored at the station when he went alone.  Then, when he returned with his father, Kumar waited at least five hours to speak with a senior officer, who threatened Kumar instead of taking down the report.  The officer then told Kumar, "oh, are you crazy, you're going to file a complaint *against the government*?"  The senior officer advised Kumar not to pressure them, warning Kumar that if he did, the police "will file a false case against you and put you in."  The police requested that Kumar leave the station.  Alarmed by the police department's failure to listen to Kumar's complaint, Kumar's parents spoke to relatives, who recommended that Kumar leave India and go to the United States.  As a twenty-one-year-old, Kumar left India on November 7, 2017.  He then traveled through various countries, and entered the United States on January 23, 2018.

---

[2] At argument, Kumar's counsel was asked whether the "sticks" referred to tree branches or batons, to which, Kumar's counsel clarified, "likely referring to batons . . . ."

After Kumar fled India, BJP members harassed his family during the springtime election season, demanding that his brother and father work for the BJP and threatening to kill them if they did not. BJP members continued to threaten his family, asking for Kumar's whereabouts and telling them that Kumar will be killed whenever found. Kumar fears that if he returns to India, the BJP, acting as the central government, will find him because any potential landlord will verify his identification with the central police, who in turn will go to his neighborhood police station in Punjab. [3] Kumar intends to continue his Mann Party activities if he is forced to return to India, and he believes that neither the Indian police nor government will protect him from the BJP.

On January 10, 2020, the IJ denied Kumar's application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), as well as his request for CAT protection. Kumar appealed the IJ's decision to the BIA. On February 8, 2023, the BIA dismissed Kumar's appeal, and on March 6, 2023, Kumar timely petitioned for review of the BIA's final order.

## II. STANDARD OF REVIEW

Kumar was found credible, so his statements are taken as true. *See Kaur*, 986 F.3d at 1221. Except to the extent the BIA expressly adopts the IJ's opinion, we limit our review to the BIA's decision, *Singh v. Garland*, 57 F.4th 643, 651 (9th Cir. 2023) [hereinafter *Singh v. Garland*], reviewing the

---

[3] *Cf. Singh*, 97 F.4th at 601 ("[The petitioner] fears that BJP . . . members will kill him if he returns to India because BJP members live all over India and he will have to provide identification to rent lodgings, which would trigger a police check and reveal his whereabouts.").

BIA's "legal conclusions de novo and its factual findings for substantial evidence," *Aden v. Wilkinson*, 989 F.3d 1073, 1079 (9th Cir. 2021) (citation omitted). "A factual finding is not supported by substantial evidence when any reasonable adjudicator would be compelled to conclude to the contrary based on the evidence in the record." *Id.* (internal quotation marks and citation omitted). Considering only the BIA's relied-upon grounds, we must remand "[i]f we conclude that the BIA's decision cannot be sustained upon its reasoning[.]" *Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) (per curiam).

## III.    DISCUSSION

### A.  Asylum

#### 1.  Past Persecution

Kumar argues that the BIA improperly concluded that his past harm did not rise to the level of persecution. "To be eligible for asylum, a petitioner has the burden to demonstrate a likelihood of 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Sharma v. Garland*, 9 F.4th 1052, 1059 (9th Cir. 2021) (quoting 8 U.S.C. § 1101(a)(42)(A)). Demonstrating past persecution "gives rise to a rebuttable presumption of future persecution," and proving it requires a petitioner to "show, among other elements, that his treatment rises to the level of persecution." *Id.* at 1060 (cleaned up).

As the BIA acknowledged, after Kumar joined the Mann Party, BJP members "threatened him and told him to join" their political party on September 1, 2017, and on October 12, 2017, BJP members punched, kicked, and hit him with wooden sticks for two to three minutes, after which Kumar

received hospital treatment for two days. The "key question is whether, looking at the cumulative effect of all the incidents that a Petitioner has suffered, the treatment he received rises to the level of persecution." *Id.* at 1061 (citation omitted). The BIA and IJ both concluded that Kumar failed to satisfy this standard. We disagree.

We first observe that the BIA properly avoided express reliance on either *Gu v. Gonzales* or *Hoxha v. Ashcroft* because unlike Kumar, the petitioners in those cases did not suffer simultaneous death threats and physical abuse. *See Gu v. Gonzales*, 454 F.3d 1014, 1017–18 (9th Cir. 2006) (finding no persecution where petitioner suffered physical harm but no death threat); *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (finding no persecution where "one incident of physical violence" was "not connected with any particular threat" of death). However, the BIA did err in its reliance on *Sharma*. Observing that the petitioner in *Sharma* "did not establish past persecution where he was detained and beaten by police with a baton and received threats over a period of years," *see Sharma*, 9 F.4th at 1063–64, the BIA concluded that Kumar did not adequately show that the threats he experienced caused "significant actual suffering or harm" so as to cumulatively constitute persecution, *see id.* at 1062 ("That is because '[t]hreats themselves are sometimes hollow and, while uniformly unpleasant, often do not effect significant actual suffering or harm.'" (quoting *Hoxha*, 319 F.3d at 1182)); *but see Kaur*, 986 F.3d at 1227 ("Death threats alone can constitute persecution[.]"). Yet, the nexus between the physical harm and the death threat matters, and unlike the petitioner in *Sharma*, Kumar experienced both in tandem. *See Sharma*, 9 F.4th at 1063–65.

In *Sharma*, the petitioner faced years of unfulfilled "anonymous and vague" threats, which did not seem to affect the petitioner's behavior, as he encouraged friends to join his ongoing public investigation against a police senior superintendent and organized a protest. *Id.* at 1064. The year after the police senior superintendent threatened to "eliminate" him and his family, the petitioner went abroad "for a business opportunity . . . and later *willingly returned*." *Id.* at 1058, 1064 (emphasis added). Then, during a one-time detention, the petitioner received "some physical abuse," but he "was ultimately released with no indication of injuries, serious or otherwise." *Id.* at 1063. The threats Sharma received while he was detained "did not lead to any further physical harm, substantial or otherwise, against [him] or his family." *Id.* at 1064; *see also id.* at 1058 (noting that while under detention, the petitioner was physically harmed and "threatened that 'worse could happen' if [he] 'continued to raise [his] voice against'" the police senior superintendent (second alteration in original)).

The "vague" and "unpleasant" threats in *Sharma*, 9 F.4th at 1064, are unlike the specific death threats Kumar suffered, *see Singh*, 97 F.4th at 604 n.2 ("Even in the absence of physical violence, we have consistently held that death threats alone can constitute persecution." (cleaned up)). The threats Kumar received were "connected" to the physical harm he experienced, *Aden*, 989 F.3d at 1083–84 n.7, which was interrupted only when a crowd gathered to witness what the BJP members were doing to Kumar. Indeed, those threats were repetitive of similar threats uttered by some of the same BJP members only the month before. *See Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1028 (9th Cir. 2019) ("We have been most likely to find persecution where threats are repeated, specific and

combined with confrontation or other mistreatment." (cleaned up)).

Moreover, in *Aden v. Wilkinson*, we recognized that although a "one-off physical beating did not compel a finding of persecution," "when the incidents have involved physical harm *plus something more*, such as credible death threats, we have not hesitated to conclude that the petitioner suffered persecution."  989 F.3d at 1082.  With respect to incidents rising to persecution, we conclude that *Aden* is a strikingly similar case.  In that case, two weeks after the petitioner experienced a so-called "'one-time incident' involving a physical beating while working at his brother's theater[,]" the brother received the petitioner's death threat on a phone call.  *Id.* at 1083.  Here too, as Kumar was heading home after his Mann Party work, BJP members physically beat him and *contemporaneously* issued a credible death threat directly to him.[4]  Rejecting Kumar's argument otherwise, the BIA discounted the physical harm and credible death threats Kumar experienced, while describing Kumar's past harm as only "threats and one beating by a group of BJP members requiring some medical treatment."  Simply put, the BIA did not recognize that a credible, "connected" death threat, *id.* at 1083–84 n.7, is the "*something more*" that establishes past persecution here, *id.* at 1082.

---

[4] We find no authority to support the dissent's implication that to demonstrate significant physical harm, the petitioner must show "permanent injuries," "broken bones," or "extensive medical treatment." To the contrary, we have recognized that past persecution may be established when a petitioner is beaten with a baton and suffered blows causing a three-day hospitalization, even absent permanent injuries, broken bones, or an extended hospital stay. *Bondarenko v. Holder*, 733 F.3d 899, 909 (9th Cir. 2013).

In describing our caselaw as a "choose-your-own-adventure," the dissent attempts to recast the settled principle that the "past-persecution analysis is best answered by comparing the facts of Petitioner's case with those of similar cases." *Singh v. Garland*, 57 F.4th at 654 (cleaned up). Here, the closest cases remain *Aden* and *Singh v. Garland*, because "[a]t bottom, those cases and this one involve fundamentally the same story: The alien was targeted multiple times for his political views, threatened (including with a death threat), assaulted (leaving non-severe physical wounds), and forced to flee his home." *Id.* at 660 (Miller, J., concurring).

We also note that "what matters, in assessing the sufficiency of the threat to establish persecution, is whether the group making the threat has the will or the ability to carry it out—not whether it is, in fact, carried out." *Aden*, 989 F.3d at 1083 (cleaned up). In the span of just over forty days, BJP members confronted and threatened Kumar twice while holding wooden sticks and attempting to recruit him either during or soon after his Mann Party activities. Both times, the BJP members fled not because they were unable or unwilling to make good on their threats, but instead because crowds emerged. The first time, they verbally threatened Kumar, and, the second time, they physically assaulted Kumar and threatened to shoot him the next time they saw him engaging in his Mann Party activities. Here, the record shows that BJP members have the will and ability to carry out the death threat against Kumar.

"Another important consideration is whether the threat leaves the person with no realistic choice but to conform to the persecutor's way of life and forsake other political or religious beliefs, or flee." *Id.* Although Kumar seeks asylum based on his political opinion (and not his religious

beliefs), we recognize that Kumar credibly testified that Mann Party members are Sikhs, while BJP members are Hindus who seek to convert everyone to Hinduism. Based on Kumar's testimony, Mann Party members, as Sikhs, represent an intersection of political and religious minority groups in India, such that changing their political party requires a religious conversion, implicating both political *and* religious beliefs. Accordingly, Kumar would need to either flee or change his religious beliefs to match his political ones, which are intertwined for both Mann Party members and BJP members.

"The death threat[s] further left [Kumar] with the 'bleak choice' of remaining steadfast in his way of life (and risking death) or succumbing to [BJP members'] demand for conformity." *Id.* at 1084. As in *Aden*, the "chain of events reveals" that the BJP "intended to coerce" Kumar to "submit to its [] political and religious order, and used offensive strategies," including a credible death threat connected to a beating, "to achieve this goal." *Id.* Here, as in *Aden*, the record also shows that BJP members "kept a close eye" and maintained a "lingering interest" in Kumar, as evidenced by Kumar's testimony that the BJP threatened his family members, asked them about Kumar's whereabouts, and told them that Kumar would be killed whenever found. *Id.* at 1083–84; *see also Singh*, 97 F.4th at 604 (concluding that the petitioner's testimony supported a past-persecution finding, where showing his family "experienced mistreatment from BJP" members who "harassed his father for being a Mann [P]arty member and harassed his family to discover [his] whereabouts").

Moreover, "we have held that an asylum applicant's claim of persecution is further strengthened when evidence that the applicant was physically beaten and threatened with

his life is presented in conjunction with evidence of the country's 'political and social turmoil.'" *Aden*, 989 F.3d at 1083 (quoting *Korablina v. INS*, 158 F.3d 1038, 1045 (9th Cir. 1998)). In its final order, the BIA acknowledged the IJ's finding "that the record describes general corruption and political unrest in India[.]" Indeed, the record evidence establishes that the BJP, as a Hindu nationalist party, targets Sikhs, that Mann Party members are Sikhs, and that Kumar is both a Sikh and Mann Party member. For example, the record includes the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor's *India 2018 Human Rights Report*, which describes "reports that the government and its agents committed arbitrary or unlawful killings," and that human rights issues in India include "[v]iolence and discrimination based on religious affiliation[.]" Record evidence also indicates that according to 2001 census data, although Sikhs represented a majority *within Punjab*, they were a minority group *in India*, comprising less than two percent of the national population. The record therefore demonstrates India's political and social turmoil, *see Aden*, 989 F.3d at 1083, which is in accord with our "recogni[tion] in multiple cases that Mann Party members have faced persistent harassment, intimidation, threats, and violence in Punjab," *Singh*, 97 F.4th at 604; *see also id.* at 603–06 (concluding that the record compels the conclusion that a low-level Mann Party member's suffered harm rose to the level of persecution (applying *Singh v. Garland*, 57 F.4th at 653–55)).

Thus, the BIA's finding is unsupported by substantial evidence because the record of the "cumulative effect of all the incidents" compels the conclusion that Kumar's past harm rises to the level of persecution. *Sharma*, 9 F.4th at 1061. In the context of India's ongoing "political and social

turmoil," *Aden*, 989 F.3d at 1083–84, Kumar's past harm rises to the level of persecution because it includes physical harm plus a credible, "connected" death threat, *id.* at 1082–84 & n.7, along with prior threats by some of the same BJP members.  Accordingly, we remand Kumar's petition to allow the BIA to complete its past-persecution analysis.[5] *See Singh v. Garland*, 57 F.4th at 653 (remanding for the past-persecution analysis's remaining components).

## 2.  Well-Founded Fear of Future Persecution

On remand, if the BIA concludes Kumar's suffered past persecution was committed at the hands of his government, then he "will be presumed to have a fear of future persecution."  *Kaur*, 986 F.3d at 1230; *see also Singh*, 97 F.4th at 606 ("If a petitioner demonstrates past persecution on account of statutorily protected grounds at the hands of individuals whom the government was unable or

---

[5] Kumar must establish that "the persecution was committed by the government, or by forces that the government was unable or unwilling to control," and that "the persecution was on account of one or more protected grounds, such as political opinion."  *Kaur*, 986 F.3d at 1221 (cleaned up).  Neither the BIA nor IJ addressed these remaining elements, so we decline to do so in the first instance.  Nevertheless, we note that at argument, the Government's counsel conceded that the BJP controls certain segments of India and, through a coalition, the national government.  Moreover, Kumar credibly testified that the BJP suppresses the Mann Party in Punjab, seeks to convert everyone to Hinduism, and is the "central government."  *See Singh*, 97 F.4th at 600 (noting that the BJP, as one of "India's major political parties," opposes the Mann Party).  Also, when Kumar went to a police station to report the BJP members, a senior officer there questioned his sanity for attempting to file a complaint "*against the government*[.]"  The BIA should consider these facts when determining whether "the persecution was committed by the government, or by forces that the government was unable or unwilling to control . . . ."  *Kaur*, 986 F.3d at 1221 (citation omitted).

unwilling to control, he is entitled to a presumption of a well-founded fear of future persecution.").

Should Kumar "establish[] a well-founded fear of future persecution at the hands of the government, a rebuttable presumption arises that the threat exists nationwide." *Singh v. Whitaker*, 914 F.3d 654, 661 (9th Cir. 2019) [hereinafter *Singh v. Whitaker*] (citation omitted). In other words, "[t]he burden then shifts to the government," *Singh*, 97 F.4th at 606, to "show by a preponderance of the evidence that the applicant either no longer has a well-founded fear of persecution in the country of his nationality, or that he can reasonably relocate internally to an area of safety," *Singh v. Whitaker*, 914 F.3d at 659. "To meet this burden, the government must demonstrate either a 'fundamental change in circumstances' or that [Kumar] could 'avoid future persecution by relocating to another part of [India], and under all the circumstances, it would be reasonable to expect [Kumar] to do so.'" *Singh*, 97 F.4th at 606 (second alteration in original) (quoting *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1089 (9th Cir. 2005)). These are issues appropriately determined by the BIA in the first instance.

## B. Withholding of Removal

"To be eligible for withholding of removal, an applicant must show that the evidence in the record demonstrates a 'clear probability of persecution.'" *Aden*, 989 F.3d at 1085–86 (quoting *Korablina*, 158 F.3d at 1045); *see also* 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."). "A clear probability exists if it is 'more likely than not' the person

will be persecuted upon return." *Aden*, 989 F.3d at 1086 (quoting *Korablina*, 158 F.3d at 1046).

"The clear probability standard for withholding of removal is more stringent than the well-founded fear standard for asylum because withholding of removal is a mandatory form of relief." *Singh*, 97 F.4th at 609. Here, the BIA concluded that Kumar failed to meet the more stringent clear probability burden because it determined he failed to meet the lower burden of asylum eligibility. *See Sharma*, 9 F.4th at 1066. Because we conclude that the BIA erred in its determination of Kumar's asylum claim, we also remand the withholding of removal claim. *See, e.g.*, *Singh*, 97 F.4th at 609 ("We therefore remand this claim to the BIA so that it can determine whether [the petitioner] has established an asylum claim, and thus benefits from a 'presumption of entitlement to withholding of deportation.'" (quoting *Canales-Vargas v. Gonzales*, 441 F.3d 739, 746 (9th Cir. 2006))).

## C. CAT Protection

"To qualify for CAT protection, a petitioner must show," *Sharma*, 9 F.4th at 1067, "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 208.16(c)(2). "[U]nlike withholding of removal under the [INA], withholding of removal under CAT is based entirely on an objective basis of fear; there is no subjective component to a petitioner's fear of torture." *Tamang v. Holder*, 598 F.3d 1083, 1095 (9th Cir. 2010); *see also* 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.").

In rejecting Kumar's CAT claim, the BIA relied on its flawed analysis of Kumar's past harm, including its incomplete description of that harm as mere "threats and a beating by BJP members." Thus, we remand Kumar's CAT claim for the BIA to reconsider whether Kumar's fear of torture is objectively reasonable. *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1076 (9th Cir. 2017) (en banc) (remanding a CAT claim, where substantial evidence compelled the conclusion of the petitioner's past persecution). When evaluating the CAT claim, the BIA should consider Kumar's credible testimony, according to which he went to a Punjabi police station and the senior officer questioned his attempt to file a complaint "*against the government*," when Kumar attempted to report how BJP members physically harmed and threatened to kill him. *See Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1184 (9th Cir. 2020) ("Government acquiescence does not require actual knowledge or willful acceptance of torture; awareness and willful blindness will suffice." (citation omitted)).

## IV.   CONCLUSION

For the above reasons, we grant Kumar's petition for review and remand for further proceedings consistent with this opinion.

**PETITION GRANTED; REMANDED.**

BUMATAY, Circuit Judge, dissenting:

The Ninth Circuit's caselaw is a bit of a "choose-your-own-adventure" when it comes to what constitutes "persecution" under immigration law. We've had so many contradictory opinions that it's quite easy to find a case supporting nearly any position. While we've often paid lip service to the extreme nature of "persecution," some of our cases hold otherwise. So, we've basically been able to pick any preferred ending when determining whether a petitioner experienced past persecution. Today, the majority adds another chapter. It says that *any* physical harm connected to *any* threat is enough to establish persecution. Never mind that case after case finds no persecution in similar circumstances. The resulting lack of clarity is a disservice to both the petitioners and immigration courts trying to follow our rules.

Given the great deference we owe immigration courts, when, as here, the Board of Immigration Appeals ("BIA") faithfully followed our precedent (at least one version of it), it should not be second guessed. In other words, there's no way that we are *compelled* to conclude that the BIA erred here when it simply followed our caselaw.

For these reasons, I respectfully dissent.

## I.

### A.

While the Immigration and Nationality Act does not define "persecution," it must be an "extreme concept." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (simplified). It "does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425,

1431 (9th Cir. 1995) (simplified).    Persecution means
something "considerably more than discrimination or
harassment." *See Donchev v. Mukasey*, 553 F.3d 1206, 1213
(9th Cir. 2009).

And *compelling* a finding of past persecution must meet
a high bar—even when faced with disturbing physical
attacks and threats.  *See, e.g.*, *Prasad v. INS*, 47 F.3d 336,
339 (9th Cir. 1995) (no past persecution when petitioner was
placed in jail, "hit on his stomach and kicked from behind,"
detained for four to six hours and interrogated about his
political allegiances, and made to understand that he would
be arrested and beaten again if he didn't do what his jailors
wanted); *Hoxha v. Ashcroft*, 319 F.3d 1179, 1181–82 (9th
Cir. 2003) (no past persecution for a single beating resulting
in two broken ribs, extensive facial bruises, and repeated
death threats); *Hussain v. Rosen*, 985 F.3d 634, 646–47 (9th
Cir. 2021) (no past persecution when the Taliban burned
down petitioner's jewelry shop, attacked a convoy of cars
including petitioner's, and petitioner was subject "to death
threats, economic harm, and psychological harm").

It is so unremarkable a proposition that many of our
cases holding that combined physical attacks and threats
don't necessarily equate to past persecution are unpublished.
*See, e.g.*, *Contreras-Villanueva v. Garland*, 2024 WL
639365, at *1 (9th Cir. Feb. 15, 2024) (unpublished) (no past
persecution when petitioner received a death threat and was
beaten twice, including being hit in the face, kicked, and cut
on his hand with a knife); *Gill v. Barr*, 765 F. App'x 225,
225–26 (9th Cir. 2019) (unpublished) (no persecution when
petitioner was beaten and threatened with death, regularly
harassed, and the following year was again severely beaten);
*Samad v. Whitaker*, 759 F. App'x 634, 636–37 (9th Cir.
2019) (unpublished) (no past persecution when the Taliban

threatened to kill petitioner and beat him with the butt of a gun, and he suffered bruises); *Argueta-Chavarria v. Barr*, 780 F. App'x 519, 520 (9th Cir. 2019) (unpublished) (no past persecution when a gang beat and subsequently harassed and threatened petitioner); *Yongsheng Cui v. Barr*, 839 F. App'x 50, 52 (9th Cir. 2020) (no past persecution when police arrested petitioner, detained him for five days, beat him, and then "handcuffed him to a chair, beat him with books in his face and with a baton on his back, [and] threatened to freeze him to death").

A recent case, *Sharma v. Garland*, 9 F.4th 1052, 1061 (9th Cir. 2021), illustrates how our review of past persecution typically works. In that case, the petitioner started receiving phone calls threatening that he would be "in big trouble" if he did not stop asking questions about someone's disappearance, who was suspected of being kidnapped by the local police. *Id*. at 1057. Things then got worse. The petitioner later received a call from the head of the local police threatening to "eliminate" him and his family if he kept asking questions. *Id*. at 1058. A few years later, after speaking out against the police chief, police officers went to the petitioner's office and an officer "beat" and "slapped" him with a baton. *Id*. He was told he was "finished" for "crossing paths with" the police chief. *Id*. The officers then tied the petitioner's hands, blindfolded him, and put him in a van. *Id*. After taking him to a locked room, they continued to threaten him, verbally abuse him, beat and slap him, and shove him around. *Id*. The next day, while still in custody, a police inspector told him to "worry about [his] family" and warned him against continuing the investigation of the missing man. *Id*. He was told "he would be permanently finished" if he didn't stop asking questions. *Id*. The whole ordeal lasted 18 to 19 hours. *Id*. While the

attacks and threats against the petitioner were "disgraceful," we held that the conduct there did not compel a finding of past persecution. *Id*. at 1063.

**B.**

Following *Sharma*'s example, we should have denied this petition for review. In *Sharma*, we compiled the commonly accepted factors used to guide our consideration of past persecution based on prior precedent. In past cases, we've routinely looked to:

> (1) "whether the petitioner was subject to 'significant physical violence,' and, relatedly, whether he suffered serious injuries that required medical treatment";
>
> (2) "whether the petitioner's harm was an isolated incident or, conversely, part of an ongoing pattern of serious maltreatment";
>
> (3) "[t]he length and quality of a petitioner's detention, if any";
>
> (4) claims of "threats," which are most relevant when they are "repeated, specific and combined with confrontation or other mistreatment"—"mere threats, without more," don't suffice;
>
> (5) whether harms have "befallen a petitioner's family members or close friends";
>
> (6) whether the petitioner suffered "[e]conomic harm," but only if the harm is "substantial economic deprivation" threatening "life or freedom"—not "mere economic disadvantage"; and

(7) whether "political and social turmoil in the petitioner's home country can provide relevant context for the petitioner's personal experiences."

*Id*. at 1061–63 (simplified).

Applying these factors, as the BIA did here, shows why we are not compelled to find past persecution. Consider each factor—

First, Kumar experienced no significant physical harm. Kumar described two incidents. One time, while he was putting up posters for the Shiromani Akali Dal Mann Party ("Mann Party"), four unknown men wearing ruling Bharatiya Janata Party ("BJP") t-shirts started ripping down the posters. When Kumar refused their entreaties to join their party and sell drugs with them, they started using "bad language" and seemed "ready to beat" Kumar. The attackers were apparently weak-kneed because they ran off as soon as other people saw them. So no physical violence this time.

On another occasion, Kumar was not so lucky. Several weeks after the first incident, as Kumar was finishing work, four men—"[s]ome men were the same" as the last time, but "some were different"—stopped him. After Kumar told them he would not leave the Mann Party, they punched him twice, kicked him, and hit him with a wooden stick. The beating lasted for two to three minutes. The result was "blue, yellowish bruises" on his knees, forehead, and back. While he was apparently admitted into a hospital for the two days after the attack, Kumar was only asked to rest, take "some tablets," and put "some sort of gel" on his injuries. That was the extent of Kumar's interactions with the BJP.

None of this amounts to significant harm. He received no permanent injuries. No broken bones. No extensive medical treatment. Rather, the minor bruises Kumar suffered are nowhere near the extreme nature of other attacks we have found constitute persecution. *Cf. Hoxha*, 319 F.3d at 1181–82 (extensive facial bruising and two broken ribs did not compel a finding of past persecution); *Wakkary v. Holder*, 558 F.3d 1049, 1059–60 (9th Cir. 2009) (no past persecution when petitioner was beaten twice—once on the street by a group of ten youths, and another time by youths who held him at knifepoint and beat him with a stick); *Sharma*, 9 F.4th at 1058 (no past persecution when petitioner was held in "captivity" for 18 to 19 hours, and was repeatedly beaten, slapped, and shoved around).

Second, Kumar's physical attack was an isolated incident. Although BJP members previously threatened him with violence, he was only physically assaulted once. And our circuit has generally found that a one-off beating is not enough to establish past persecution. *See Sharma*, 9 F.4th at 1063 (no past persecution when petitioner's physical harm was "limited to one episode"); *Gu v. Gonzales*, 454 F.3d 1014, 1020 (9th Cir. 2006) (no past persecution when petitioner "was detained and beaten on only one occasion"); *Hoxha*, 319 F.3d at 1182 (no past persecution when petitioner was harassed, threatened, and beaten once). Of course, a single attack might constitute persecution if it was sufficiently severe. But the relatively minor attack here doesn't meet the mark.

Third, aside from the few minutes of the attack, Kumar was never detained by BJP members—even though they were supposedly part of the ruling political party in Kumar's hometown. Compare this lack of detention to the petitioner in *Sharma*, who was blindfolded, forced into a van, and

detained for 18 to 19 hours by police officers. 9 F.4th at 1063–64. Despite this prolonged detention by government officials, we still found no persecution.

Fourth, Kumar alleges only two vague threats. He claims the unknown men threatened his life during the two encounters. During the first encounter, one unidentified man with a wooden stick threatened to kill Kumar if he put up Mann Party posters again. During the second encounter, the nameless men warned Kumar that if they saw him doing "this" next time—presumably, but we don't know, that "this" refers to working for the Mann Party—they would shoot him. But Kumar never saw them with a gun or any other weapon besides "wooden sticks." These are exactly the types of "generally anonymous and vague" threats that don't establish past persecution. *See Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1028 (9th Cir. 2019) (finding threats not "sufficiently serious and credible" to compel finding past persecution when petitioner thought these individuals were hitmen or "sicarios," but did "not personally know" if they had ever carried out their threats). While "unpleasant," the threats didn't cause "significant actual suffering or harm" to Kumar. *Id*. (simplified). Indeed, the first threat didn't deter Kumar from continuing his political work. He didn't even bring the first threat to the attention of the police.

Fifth, none of Kumar's family members have been harmed. Kumar recalled that unknown BJP members started harassing his father and brother around an election and they too were threatened with death if they did not work for the BJP. Kumar also claimed that the BJP was still asking his parents about his whereabouts. Even so, despite not acceding to the BJP members' supposed threats, Kumar's family has remained in India unharmed. Thus, the safety of his family also supports the lack of persecution. *Cf. Estrada*

*v. INS*, 775 F.2d 1018, 1022 (9th Cir. 1985) ("The absence of harassment of an alien's family tends to reduce the probability of persecution." (simplified)).

Sixth, Kumar wasn't subject to any economic deprivation. He was employed when he left India even though the BJP apparently controlled the region.

Lastly, nothing in India's political or social conditions shows that Kumar suffered past persecution. Kumar was not a longtime, well-known, or high-level member of the Mann Party. In fact, he only joined the party nine months before he was first accosted over putting up posters. While India has documented political strife, the record, as found by the immigration judge, does not show that the BJP systematically targets low-level Mann Party members like Kumar. According to country reports, there is no "general risk" of "ill-treatment" of the Mann Party and the Party "operates openly." Unless suspected of terrorism, the record confirms that "outspoken [Mann Party] members were not harassed or arrested for participating in party gatherings."

Adding all this together, substantial evidence supports the BIA's conclusion that Kumar didn't establish past persecution. Under the deference we owe to the BIA and the support of our past precedents, this record can't *compel* the conclusion that the BIA was wrong. And the BIA sufficiently explained its reasons for not finding past persecution even if it didn't tick through each of the *Sharma* factors. After all, we don't require the BIA to write "an exegesis." *See Lopez v. Ashcroft,* 366 F.3d 799, 807 n.6 (9th Cir. 2004). Instead, the BIA need only "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.*

## C.

In granting this petition, the majority takes our already contradictory caselaw and adds more confusion.  Rather than acknowledge the weakness of Kumar's case, the majority creates a novel test for calculating "past persecution." Because Kumar suffered physical harm "in tandem" with receiving a death threat, the majority decides he meets "past persecution," and we can disregard all our precedent on the issue.  Maj. Op. 9.  All this no matter how minor the harm or how indeterminate the threat.  To the majority, the only thing that counts is the connectedness between the physical harm and death threat here.  So, in the majority's view, *any* "physical harm" plus *any* "death threat" equals "past persecution." *Id*. at 9–10.  But immigration law can't be reduced to a formula.  And under the majority's novel formula, how connected is connected enough?  Does it need to be instantaneous?  How about five minutes later?  An hour?  Or a day?  The majority doesn't say.

*Sharma* is thrown out, according to the majority, because the threats in that case were not made at the exact moment that the petitioner was being attacked.  Even if this "tandem rule" were a material distinction, which seems odd, it also misreads *Sharma*.  In that case, the petitioner was physically attacked and threatened *at the same time*. *Sharma*, 9 F.4th at 1058.  The petitioner was beaten, detained, and the next morning, while still being detained, he was "threatened that 'worse could happen' if [the petitioner] 'continued to raise [his] voice against' [the police chief]" and told he needed to "worry about [his] family" or he "would [be] dealt with in a manner like others." *Id*.  So it was during one sustained detention that Kumar was physically harmed *and* threatened. Thus, the supposed "tandem rule" isn't a reason to distinguish *Sharma*.

We also can't ignore that *Sharma* has more aggravated facts than this case. In *Sharma*, the beatings, detention, and threats came from named police officers over an 18 to 19-hour period. Here, we have unknown men threatening to shoot Kumar with a non-existent firearm during a minor assault lasting two to three minutes. If *Sharma* doesn't represent past persecution, then this case shouldn't either. Instead, the majority essentially overrules *Sharma*, which it can't do. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003).

Aside from kneecapping *Sharma*, the majority aggrandizes *Aden v. Wilkinson*, 989 F.3d 1073 (9th Cir. 2021). It expands *Aden*'s "something more" language to a degree that undoes decades-long precedent. *See id.* at 1082. According to the majority, any vague threat counts as "something more." Maj. Op. 11. But the "something more" contemplated in *Aden* requires something comparable to the extreme facts of that case. There, the petitioner worked at his brother's movie theater in Somalia, which featured American and Hindi movies and sports. *Id.* at 1077. An Islamic terrorist group affiliated with Al-Qaeda and the Islamic State twice ordered the movie theater to shut down for showing "Satanic" movies. *Id.* Later, ten members of the terrorist group raided the theater, physically beat the petitioner, "cudgeled him on the head with the butt of a rifle, causing him to bleed profusely," and destroyed and stole property to ensure the theater would remain closed. *Id.* at 1083–84. The petitioner went into hiding, but the terrorists tracked down his brother and warned that the petitioner would be killed if the theater reopened. *Id.* at 1077–78. We viewed this Islamic terrorist group as "a major force in the country, and a danger to many." *Id.* at 1084. Under these

tragic facts, we found past persecution even though the physical harm by itself wasn't so severe. *Id*. at 1082.

And *Singh v. Garland*, 57 F.4th 643, 654 (9th Cir. 2023), doesn't help either. There, the petitioner was a *minor* and he and his brother were "repeatedly" and "specifically" targeted for attack over a two-year period. *Id*. at 655–56. The minor received injuries after being beaten with hockey sticks, and his brother suffered "serious internal injuries" from the attacks. *Id.* at 649. The minor was told he was going to be killed. *Id*. In that case, we focused on the petitioner's age, noting that "[a]ge can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted[.]" *Id.* at 654 (quoting *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1045 (9th Cir. 2007)).

Now let's contrast these cases with Kumar's situation. First, a few unknown and anonymous supposed BJP members stumbled across him in public, asked him to sell drugs, threatened him but then fled when other people scared them off. A few weeks later, Kumar was approached—again seemingly at random—by unknown BJP members, some of whom Kumar thought resembled the men from before. This time the unknown men beat him with sticks and made a vague threat to shoot him, even though there's never been any allegation of any man possessing a gun. While these events happened, Kumar was well into adulthood. And all this with no record of low-level Mann Party members being systematically killed or beaten. As is obvious, this case is nothing like *Aden* or *Singh*.

And finally, to justify its ruling, the majority oversteps its bounds by engaging in blatant unadulterated factfinding. The majority asserts that BJP members "kept a close eye"

and maintained a "lingering interest" in Kumar.  Maj. Op. 13.  But none of this was found by the IJ or BIA.  And nothing in the record shows that all the incidents alleged by Kumar were the same men—let alone based on some secret plot within the BJP.  So the majority uncovers a conspiracy all on its own.  But this is more Scooby-Doo than Sherlock Holmes.

Even worse, the majority goes on to find that the BJP, the ruling party of India, targets Sikhs for violence.  Maj. Op. 14.  There's several problems with this diplomacy-busting view.  First, it contradicts the finding of the BIA and IJ.  And second, while a country report noted "reports" of unlawful killings, nowhere in the report does it say that Sikhs are the systematic victims of such killings or that the BJP is responsible for that violence.  Indeed, the majority overlooks other parts of the same country report that says that there "were no restrictions placed on . . . individuals of any community from participating in the election process" and minorities "freely participate[]" in the political process.  Members of the Sikh community, in fact, have "reserved seats" in India's lower house of parliament.  The majority's careless factfinding is totally inappropriate here.

## II.

As the BIA concluded, *Sharma* shows there's no past persecution.  Instead of second guessing the BIA and opening a new chapter in immigration-law adventures, we should have denied Kumar's petition outright.